IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARY FENDER,                                              )
                                                         )
                    Plaintiff,                           )
                                                         )
          v.                                             )        C.A. No. 12-cv-1364-GMS
                                                         )
MICHAEL SMITH, in his individual capacity, and )
THOMAS EOPPOLO, in his individual capacity.    )
                                                         )
                    Defendants.                          )
                                                         )

## MEMORANDUM

## I.   INTRODUCTION

On October 25, 2012, the plaintiff, Mary Fender ("Fender"), filed a Complaint (D.I. 1)

against Michael Smith ("Smith") and Thomas Eoppolo ("Eoppolo") (collectively "the

Defendants") and against the Delaware Division of Revenue ("the DOR"). On May 30, 2014, the

DOR and the Defendants filed motions for summary judgment. In response to Fender's First

Amendment retaliation claim (the "Claim"), the Defendants raised the defense of qualified

immunity as part of their motion for summary judgment. (D.I. 36, 37.) The court granted the

Defendants' motion, but on the ground that Fender had not engaged in protected speech under the

First Amendment. (D.I. 49, 50) ("the Decision"). The Decision did not address the qualified

immunity defense or the remaining two elements of Fender's Claim. Fender appealed the Decision

to the United States Court of Appeals for the Third Circuit. In an opinion by The Honorable

Marjorie O. Rendell, the Third Circuit vacated in part and remanded in part the case for the court

to assess the other elements of Fender's Claim. The Third Circuit affirmed the Decision with

respect to Fender's claim under Delaware's Whistleblower's Protection Act against co-defendant,

the DOR.[1]  Presently before the court is the Defendants' Motion for Summary Judgment (D.I. 36) and the additional briefing.  (D.I. 57, 58.)[2]  For the reasons that follow, the court will grant the Defendants' motion.

## II.    BACKGROUND

The facts presented by the record are briefly summarized here.[3]  Fender began working for the Delaware Division of Revenue ("DOR") in 2003.  Her position was originally in Wilmington, but in 2005 she transferred to New Castle.  Between 2009 and 2010, the DOR reorganized. Eoppolo became Fender's supervisor and Smith became Eoppolo's supervisor.  In April 2010, Smith transferred Fender's position back to Wilmington and asked her to return there by May 2010.  She returned to Wilmington on December 14, 2010 and then, six days later, she requested a transfer to the Dover office.  Fender claims that the commute was no longer manageable and that Smith had previously granted a male employee's transfer request on that basis.  Smith rejected Fender's transfer request and noted in an email that Fender was "trying to sell her agenda." (D.I. 53-1 at 3) (quoting App. 333).  In his deposition, Smith further explained that Fender's "idea was that the Division of Revenue in her opinion discriminated against women as a whole."  (*Id.*) (quoting App. 581–82).

On December 22, 2010, Fender complained to DOR Deputy Director Colleen Yegla about unfair treatment in the DOR.  Fender claimed that Smith denied her transfer request because she was a woman.  Fender also complained that Eoppolo had called her on her personal cell phone

---

[1] As a result, the Delaware Division of Revenue is no longer a party to this litigation.

[2] On March 4, 2016, the parties participated in a telephonic status conference to discuss how the matter should proceed.  The court ordered additional briefing on the qualified immunity defense. (D.I. 56.)

[3] The facts will be viewed in the light most favorable to the nonmoving party and all reasonable inferences from the evidence will be drawn in that parties' favor.  *Conopco, Inc. v. United States*, 572 F.3d 162, 165 (3d Cir. 2009).  For additional discussion of the facts, see the prior opinions. (D.I. 49, 53-1.)

while she was at a doctor's appointment and that he did not approve her financial transactions promptly.

Fender filed an EEOC complaint on February 11, 2011, alleging sex and age discrimination against Smith and Eoppolo. (Ex. 129.) Her EEOC complaint described the incident when Eoppolo called her while she was at the doctor and Smith's denial of her transfer request. Fender said that Eoppolo called at the doctor's appointment in an effort to intimidate her, while "he does not chek [sic] up on male counterparts." (D.I. 53-1 at 3) (quoting App. 808). Fender also complained that men were promoted faster than women at DOR. (Ex. 129 at 3.) She said that she spoke about this with a coworker in the HR department who responded that she "didn't know how they get away with some of the things they do." (*Id.*)

On the day that Fender filed her EEOC claim, she asserts that Eoppolo began to require that she report to him weekly. (Ex. 104.) Fender also alleges that after she filed her claim, she was not allowed to communicate with Tim Drumm or Bill Pfeifer, who were both integral to her completing her employment duties and her supervisors stopped her from starting new projects, gave her pre-existing projects to others, and limited the number of letters that she could send. (D.I. 42 at 7; Ex. 119, 185:1–12.) She claims that a coworker told her "he was not supposed to talk to me, that I was blackballed, and when they want to try to find a way to get you out they will." (D.I. 53-1 at 4) (quoting App. 715). Co-worker Martha Dennison also testified that for the duration of her remaining employment with DOR, Fender's duties and assignments were reduced in a way that Dennison believed to be unusual and an act of retaliation. (Ex. 135 at ¶19, 24–25, 27.)

In July of 2011, Fender went on short-term disability following a car accident. She exhausted her permitted leave before returning to work. (Ex. 15.) The DOR said she could return to her previous job on a probationary basis, but Fender refused and her employment with DOR

concluded. Fender avers that she was not notified of the termination or supported in returning to work in a new role within DOR in accordance with the DOR's policy. (D.I. 42 at 11–12.)

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). A genuine dispute exists "if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Id.* The moving party bears the burden of proving that summary judgment should be granted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986). The district court must view the evidence in the light most favorable to the nonmoving party and draw inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the nonmoving party must present enough evidence to enable a jury to reasonably find for it on that issue. *Id.* The party opposing summary judgment must present more than just "mere allegations, general denials, or . . . vague statements" to show the existence of a genuine issue. *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991). The moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an essential element of its case for which it has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

The Defendants argue that Fender has failed to establish a First Amendment retaliation claim. The Defendants further contend that they are entitled to qualified immunity. The court examines the parties' arguments below.

## A. Retaliation

The court will first consider the retaliation claim on the merits. At issue in this case is Fender's claim that her right to be free from retaliation for exercising protected speech was violated when she was subjected to adverse action for her speech that asserted claims of gender discrimination. (D.I. 43 at 19.) The First Amendment bars retaliation for protected speech. *See Crawford v. Britton*, 523 U.S. 574, 592 (1998); *Milhouse v. Carlson*, 652 F.2d 371, 373–74 (3d Cir. 1981). Proof of a retaliation claim requires the plaintiff to demonstrate (1) she engaged in protected activity; (2) she was subjected to adverse actions by a state actor; and (3) the protected activity was a substantial motivating factor in the state actor's decision to take adverse action. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).

Regarding the first prong, on October 14, 2015, the Court of Appeals ruled that there is sufficient evidence to conclude that Fender's complaint about gender discrimination touched on a matter of public concern that involved more than her private grievances. (D.I. 53-1 at 6.) The Third Circuit was persuaded by Smith's statement that Fender was trying to sell her agenda "that the Division of Revenue in her opinion discriminated against women as a whole." *Id.* (quoting App. 582.) The opinion also noted that Fender's EEOC complaint stated that her supervisor does not check up on male workers and that her coworker in Human Resources said "she didn't know how they get away with some of the things they do." *Id.* (quoting App. 808.) In addition, Judge Rendell considered that Fender noted in her EEOC form that a woman, "ha[d] been waiting for her test for promotion to be graded for 1 yr." even though "male counterparts got interviews for

5

their promotions." *Id.* (quoting App. 809.) The opinion concludes that Fender was complaining about a matter of public concern and therefore engaged in protected speech.

The court will now consider the two remaining elements of the retaliation claim based upon the previously submitted briefs. (D.I. 37, 43, 45.) Having conducted the threshold determination and concluded that Fender was engaged in protected activity, the court must next consider whether Fender was (2) subjected to adverse actions by a state actor; and (3) whether the protected activity was a substantial motivating factor in the state actor's decision to take adverse action. *Rauser*, 241 F.3d at 333.

Fender argues that as a result of protected activities, she was subjected to a pattern of adverse actions by Smith and Eoppolo. Specifically, Fender alleges that on February 11, 2011, the same day that Fender mailed in her EEOC complaint and informed Yegla and Donnelly, she was told by Eoppolo that she had to report to him on a weekly basis, despite the fact that no other auditor was required to do the same. (D.I. 43 at 11.) Moreover, Fender claims that after she complained to Yegla and Donnelly about discrimination, Eoppolo reprimanded her for attending a meeting with IT staff members and Smith instructed them not to plan meetings with her. (*Id.* at 17; D.I. 38-1 at A110.) Fender claims that she was removed from all but one project. (D.I. 43 at 19.) This is supported by her testimony at her deposition. (D.I. 38-1 at A103, A125, A130a.) Moreover, Fender's co-worker Martha Dennison also testified that Eoppolo began to micromanage Fender and question whether she was "even working" when she was absent from work for pre-approved reasons. (D.I. 43 at 17–18, Ex. 135 ¶15–16.)

Fender also alleges that she was constructively discharged. (*Id.* at 18–19.) Fender went on leave in July 2011, following an automobile accident, and alleges that Eoppolo sent her a letter on August 15, reprimanding her for not reporting her leave to him, although she was not required

6

to do so. (*Id.*; D.I. 38-1 at A112.) Ultimately, Fender claims she was told she would have to either return to her position on probation, or not return at all.

The Defendants contend that there was no adverse employment action. They claim the email asking Fender to obtain permission before attending off-site meetings occurred after the meeting with Yelga, but prior to the EEOC charge and the complaint to Donnelly. (D.I. 45 at 9.) The Defendants argue that the February 11, 2011 email and Eoppolo's asking where Fender was were not reprimands and did not constitute an adverse employment action, but normal supervision. (*Id.* at 9–10.) Finally, with regard to the constructive discharge argument, the Defendants note that there is no evidence that Eoppolo resigned rather than went on disability. They assert that Fender rejected her job when it was offered back. (*Id.*)

Determining whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact intensive analysis. The Third Circuit has provided guidance on what kinds of action constitute a "tangible adverse employment action" in *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 152–54 (3d Cir. 1999), noting that economic impact is an important factor, but "not the sine qua non. If an employer's act substantially decreases an employee's earning potential and causes significant disruption in his or her working conditions, a tangible adverse employment action may be found." *Id.* at 153. Retaliatory action typically relates to "promotion, transfer, recall and hiring, based on the exercise of an employee's First Amendment rights." *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003) (quoting *Suarez Corp. Industries v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000)) (internal quotations omitted); *see also Rutan v. Republican Party*, 497 U.S. 62 (1990) (instructing that "promotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees.") *Id.* at 75. "On the other hand, courts have declined to

find that an employer's actions have adversely affected an employee's exercise of his First Amendment rights where the employer's alleged retaliatory acts were criticism, false accusations, or verbal reprimands." *Brennan*, 350 F.3d at 419 (quoting *Suarez Corp. Industries*, 202 F.3d at 686) (internal quotations omitted).  The *Brennan* court found that allegations that a supervisor stopped using Brennan's title and did not capitalize his name did not rise to the level of substantive constitutional violations "because, even if true, they are *de minimis.*"  However, "Brennan's allegation that he was taken off the payroll in December 1994 and given 2–day, 21–day and 63–day suspensions would obviously support a cause of action for illegal retaliation under § 1983." *Id.*

In *Suppan v. Dadonna*, the Third Circuit concluded that a public employee may allege a violation of First Amendment rights based upon conduct that amounts to retaliatory harassment even if he cannot prove that the alleged retaliation adversely affected the terms of employment. 203 F.3d 228, 234–35 (3d Cir. 2000).  In this case, the conduct involved the lowering of ratings on employees' promotion evaluations and discouraging comments towards employees because of their union activities and support for a particular mayoral candidate supported a claim of retaliation.  *Id.* at 232–34.  The *Suppan* court concluded that the alleged retaliatory conduct was sufficient "to deter a person of ordinary firmness" from exercising his First Amendment rights and that some relief may be appropriate.  *Id.* at 235.

In the current case, the court finds that while the alleged micromanaging and alleged reprimands, may be *de minimis*, this conduct in combination with Fender's testimony that Eoppolo reduced Fender's job responsibilities and prevented her from planning meetings with colleagues are sufficient to establish a retaliation claim.  As the Third Circuit has recognized, "[t]he cumulative impact of retaliatory acts may become actionable even though the actions would be *de*

*minimis* if considered in isolation." *Brennan*, 350 F.3d at 422 n.17 (3d Cir. 2003). Moreover, "a plaintiff may be able to establish liability under § 1983 based upon a continuing course of conduct . . . ." *Id.* at 418 n.16.

Fender's testimony that she was blackballed and that her assignments were taken away creates issues of material fact. There is no doubt that employers have discretion to rearrange assignments and that this alone does not constitute an adverse action. *See McKee v. Hart*, 436 F.3d 165, 171 (3d Cir. 2006) (holding that despite the fact that the plaintiff was removed from an investigation, there were not facts to support retaliation where the plaintiff suffered no alteration in his employment benefits, pay, or job classification.) If, however, Fender was effectively put in a position where she could no longer do her job, this amounts to "*serious and substantial tangible harm,* which alters an employee's compensation, terms, conditions or privileges of employment[.]" *Riding v. Kaufmann's Dep't Store*, 220 F. Supp. 2d 442, 463 (W.D. Pa. 2002). Fender testified that she was not permitted to speak with IT staff members. (Ex. 119, 88:21–89:3, 89:15–18, 90:2–8, 187:21–188:24.) Fender also testified that Smith and Eoppolo took away her most profitable project, (*id.* at 125:12–126:12), and stopped other projects. (*Id.* at 86:10-87:2.) According to Fender, no further projects were ever approved for the entirety of her employment. (*Id.* at 185:1–12.) Dennison also attested to the reduction in Fender's work. (Ex. 135, ¶ 189, 24–25.) A jury could conclude that the alleged actions in this case, taken together, would have deterred a person of ordinary firmness from exercising her First Amendment rights.

On the other hand, Fender's assertion that a constructive discharge provides the adverse employment action is unlikely. A constructive discharge claim arises when "the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." *Goss v. Exxon Office*

*Systems Co.*, 747 F.2d 885, 887–88 (3d Cir. 1984). A deciding court should consider evidence, such as threats of discharge or pressure to resign, demotions or reductions in pay or benefits, alterations in job responsibilities, negatives evaluations, and false accusations of misconduct. *See Clowes v. Allegheny Valley Hospital*, 991 F.2d 1159, 1161 (3d Cir.1993); *Levendos v. Stern Entertainment, Inc.*, 860 F.2d 1227, 1231 (3d Cir. 1988); *Baker v. Consol. Rail Corp.*, 835 F. Supp. 846, 852 (W.D. Pa. 1993) *aff'd,* 30 F.3d 1484 (3d Cir. 1994).

On its face, Fender's testimony sounds in the logic of a constructive discharge claim; she suggests that her responsibilities were altered and that she was prevented from fulfilling her role in a manner that would cause a reasonable employee to resign. The problem with her argument is that she did not elect to resign—rather she used her allotted time on short term disability and was terminated on this basis. Moreover, Fender made efforts to maintain her employment by contesting whether she should continue to receive a longer period of disability status in order to later return to work. These facts are not sufficient to support a constructive discharge claim. Additionally, there is no evidence that Fender's supervisors pressured her to resign, only that they enforced the legitimate terms of the short and long term disability policy. In short, the evidence does not suggest that Fender made a decision to resign because working conditions were "*so unpleasant* or intolerable that a *reasonable person in the employee's shoes* would resign." *Riding*, 220 F. Supp. 2d at 463.

Moving to the third prong, in a First Amendment retaliation case, the plaintiff has the initial burden of showing that his constitutionally protected conduct was a "substantial" or "motivating factor" in the relevant decision. *Mt. Healthy City School Bist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 270–71, n. 21 (1977)). Once the plaintiff carries this burden, the burden shifts to the

defendant to show "by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct." *Id.* In *Abramson v. William Paterson College*, 260 F.3d 265 (3d Cir. 2001), the Third Circuit emphasized that it is the timing of the retaliation and evidence of continuing animosity that would lead one to infer a connection between the protected speech and the adverse action. *Id.* at 288. Smith and Eoppolo argue that they were not even aware that Fender had complained of discrimination. However, the timing of the alleged conduct and the protected speech, in some of the allegations a matter of days, is sufficiently close that one could infer a connection. (D.I. 37 at 16.) While Fender ultimately was terminated for surpassing the allotted period for disability, material issues of fact remain as to whether the events overall give rise to the conclusion that the protected speech was a motivating factor in the pattern of conduct that subsequently occurred, specifically the reduction of assignments, the close micromanaging, and the blackballing.

In conclusion, a reasonable jury could conclude that the facts rise to the level of retaliatory conduct prohibited under the First Amendment. However, the court must also consider whether the Defendants are entitled to immunity under the doctrine of qualified immunity. For the reasons discussed below, Fender's claim cannot survive.

### B. Qualified Immunity

The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established constitutional or statutory rights. "Thus, the Court asks (1) whether the facts alleged by the plaintiff show the violation of a constitutional right, and (2) whether the law was clearly established at the time of the violation." *Wooleyhan v. Cape Henlopen Sch. Dist.*, No. CIV.A. 10-153, 2011 WL 1875710, at \*24 (D. Del. May 17, 2011) (quoting *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir.2010)). As

11

previously discussed, a reasonable jury could find that there was a deprivation of Fender's First Amendment right in this case. The court will now turn to the second prong of the qualified immunity analysis and determine whether, assuming that Fender's constitutional right was violated, that right was clearly established at the time of the alleged conduct.

Fender argues that the Defendants are not entitled to qualified immunity for violating her rights. Specifically, Fender contends that the Supreme Court has rejected the need for strict factual similarity in order for a court to find that a right is clearly established. (D.I. 58 at 3.) Fender relies on the Supreme Court decision in *Anderson v. Creighton* and argues that the very action in question need not have previously been held unlawful. 483 U.S. 635, 640 (1987). Rather, the "contours of the right" must be sufficiently clear such that the unlawfulness of the action is apparent in light of pre-existing law. *Id.* According to Fender, flexibility is particularly important when reviewing First Amendment claims because the Supreme Court has noted "the enormous variety of fact situations" in which a public employee claims First Amendment protection. (D.I. 58 at 3) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). Fender insists that if the court defines the right too narrowly, qualified immunity would essentially render § 1983 toothless in permitting individuals to sue for First Amendment violations. (*Id.* at 4.)

The Defendants argue that it was not clearly established that Fender's speech was constitutionally protected, nor the minimal alleged retaliatory action by Smith and Eoppolo constitutionally forbidden. The Defendants rely on the Supreme Court decision in *Barkes* and subsequent decisions, which they contend stand for the proposition that to defeat qualified immunity, there must be a (1) a narrowly defined right at issue and (2) a Supreme Court case closely on point or a "robust consensus of persuasive authority." (D.I. 57 at 2) (quoting *Taylor v. Barkes*, 135 S. Ct. 2042 (2015)). According to the Defendants, Fender has failed to cite to any

Supreme Court precedent or any authority coming close to what could be considered as a "robust consensus of persuasive authority" on any particular right. (*Id.*) Defendants contend that Fender has only offered the "generalized right" to be free from retaliation for exercising protected speech. (D.I. 43 at 19.) Defendants further assert that if they are not entitled to qualified immunity, "every personal grievance coupled with an unsupported claim that employee action is based upon discrimination will rise to constitutional dimensions and subject managers in state government to the pains and distractions of litigation and the potential for personal liability." (D.I. 57 at 5.)

The court will begin the qualified immunity analysis by determining whether, at the time of the alleged conduct, it was clear that Fender's speech relating to gender discrimination was constitutionally protected. "A right is clearly established if its outlines are sufficiently clear that a reasonable officer would understand that his actions violate the right." *Sterling v. Borough of Minersville*, 232 F.3d 190, 193 (3d Cir. 2000). At the time of the alleged conduct, in order for a public employee's speech to be protected under the First Amendment, (1) she must have made the statements as a citizen, (2) the statement must involve a matter of public concern, and (3) the government employer must not have an adequate justification for treating the employee differently from a member of the public. *Hill v. Borough of Kutztown*, 455 F.3d 225, 241–42 (3d Cir. 2006) (citing *Garcetti*, 547 U.S. at 418). A public employee's statement is a matter of public concern when it relates "to any matter of political, social or other concern to the community." *Brennan*, 350 F.3d at 412 (quoting *Baldassare v. State of N.N.*, 250 F.3d 188, 195 (2001)).

In *Connick v. Myers*, 461 U.S. 138, 149 (1983), the Supreme Court held that protected speech must be regarding "a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal." The Court observed:

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Id.* at 147. *See also Czurlanis v. Albanese*, 721 F.2d 98, 104 (1983). The *Connick* court observed that racial discrimination was a matter of public concern. *Connick,* 461 U.S. at 148 n.8. Likewise, later decisions have held that claims of gender discrimination are matters of public concern. *See Azzaro v. Cnty. of Allegheny*, 110 F.3d 968, 978 (3d Cir. 1997) (en banc) (holding that "gender discrimination" is "as much a matter of public concern as racial discrimination").

Importantly, allegations of discrimination by public employees do not automatically become matters of public concern. For example, in *Mitchell v. Miller*, 884 F. Supp. 2d 334 (W.D. Pa. 2012), the plaintiff complained that her superiors had subjected her to unfair treatment on the basis of her gender. *Id.* at 363. Mitchell argued that "gender discrimination and harassment are inherently matters of public concern." *Id.* at 364. Contrary to her assertion, the court explained that *Connick's* application to complaints about sex-based discrimination is not categorical. *Id.* at 363. The court concluded that Mitchell's complaints were not of sufficient "value to the process of self-governance" to require constitutional protection. *Id.* at 365 (citing *Azzaro*, 110 F.3d at 979–80.)

One important factor is whether the defendant is a public official. *Azzaro v. County of Allegheny* addressed the question of whether a public employee's speech regarding sexual harassment constituted protected speech, where the plaintiff was a former Allegheny County employee who was fired after reporting that she was sexually harassed by an assistant to the Allegheny County Commissioner. *Id.* at 970. The plaintiff subsequently sued Allegheny County and two county employees, claiming retaliation for speech protected by the First Amendment, in

violation of § 1983. *Id.* at 975. Applying the analytical framework laid out by the Supreme Court in *Connick,* the court noted that the key to the "public concern" inquiry is "whether expression of the kind at issue is of value to the process of self-governance." *Id.* at 977. The court explained that "the issue is whether it is important to the process of self-governance that communications on this topic, in this form and in this context, take place." *Id.* Examination of "all of the surrounding circumstances" is required. *Id.* at 980. In *Azzaro,* one important factor was that the alleged harassment "brought to light actual wrongdoing on the part of one exercising public authority that would be relevant to the electorate's evaluation of the performance of the office of an elected official." *Id.* at 978.

Another important factor is the quantity of incidents alleged. In *Rode v. Dellarciprete*, 845 F.2d 1195 (3d Cir. 1988), the Third Circuit explained that when an employee complained regarding her own personal employment problems, this could rise to the level of public import given that the agency faced allegations of discrimination more broadly. *Id.* at 1201–02. "This was a matter of grave public concern, especially in light of the prior protracted history of litigation against the [agency] charging it with racial animus in its employment practices[.]" *Id.* The *Rode* opinion instructs the deciding court to consider "[t]he content, form, and context" of a speaker's comments. *Id.* at 1201. The *Rode* court also considered it important that the plaintiff in this case had been contacted for an interview, illustrating the public importance of her speech: "when a public employee participates in an interview sought by a news reporter on a matter of public concern, the employee is engaged in the exercise of a first amendment right to freedom of speech, even though the employee may have a personal stake in the substance of the interview." *Id.* at 1202. Similarly, in *Montone v. City of Jersey City*, 709 F.3d 181 (3d Cir. 2013), the court found that speech was protected where the plaintiff alleged claims of gender discrimination by a public employee in the

wake of a successful sexual harassment lawsuit against the same agency. In 2003, Montone informed a captain that a Lieutenant was sexually harassing an officer. The court observed that while Montone's allegations of gender discrimination and harassment do not directly concern an elected official, the fact that Montone's speech would not directly help the public evaluate an elected official's performance is not dispositive. *Id.* at 193–95. Rather, the court considered it important that there were are at least three separate instances of alleged sexual harassment, and the inappropriate conduct was not directed solely at Montone. *Id.*

After reviewing the relevant case law, the court must conclude that the law on First Amendment retaliation for complaints of gender discrimination was not sufficiently clear at the time to put a state actor on notice as to whether Fender engaged in protected speech. Specifically, the question of when speech about gender discrimination motivated by a private concern rises to the level of protected public speech was not sufficiently clear. *See, e.g., Montone*, 709 F.3d at 194 ("[N]ot every statement about sexual discrimination involves a matter of public concern . . ." (quoting *Campbell v. Galloway*, 483 F.3d 258, 269 (4th Cir. 2007))). While it is not the case that "speech which is motivated by private concern can never qualify as protected speech[,]" *Brennan*, 350 F.3d at 412, there is not a definite consensus as to when "a matter [] concerns the public as well as the speaker." *Id.* As the Fourth Circuit noted, while "not every statement about sexual discrimination involves a matter of public concern, our cases have provided little concrete guidance on the question of when such a complaint amounts to an issue of public concern." *Campbell*, 483 F.3d at 269. The *Campbell* court further explained:

> We see no reason to try to articulate any sort of bright-line rule in this case, nor are we certain that a bright-line rule would be consistent with the Supreme Court's directive that we engage in a case-and fact-specific inquiry to determine "[w]hether an employee's speech addresses a matter of public concern," by considering "the content, form, and context of a given statement, as revealed by the whole record."

*Id.* (quoting *Connick*, 461 U.S. at 147–48).

"'[C]learly established rights' are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right." *McLaughlin v. Watson*, 271 F.3d 566, 571 (3d Cir. 2001) (quoting *Anderson*, 483 U.S. at 640). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (internal citations omitted). Accordingly, the court cannot conclude that the constitutional right that Fender alleges was clearly established at the time. *See McKee v. Hart*, 436 F.3d 165, 173 (3d Cir. 2006) (concluding that "because of the dearth of precedent of sufficient specificity (and factual similarity to this case) regarding a public employee's First Amendment right to be free from retaliatory harassment by his or her employer" the defendant was entitled to qualified immunity).

## V.    CONCLUSION

For the reasons stated above, the court will grant in part the Defendants' Motion for Summary Judgment (D.I. 36) because qualified immunity applies in this case.


Dated: August _2 5_ 2016                          _____
                                                  UNITED STATES DISTRICT JUDGE